Good morning, your honors, and may it please the court. I'm Jerome Congress, representing the appellants who are security holders in eight of the American mutual funds. I believe this is the first opportunity this court has had to write on what the standard is that a district court should use in evaluating the evidence in a 36B case. So I think it's a significant appeal both for that reason and because we believe that the district court below applied a clearly erroneous standard. Well, in that regard, I appreciate where you're going, Mr. Congress, but I'll be fair, it doesn't do us much good to write if the Supreme Court's already told us what we're supposed to write. Well, that is true, your honor, but I believe that if the standard that was articulated below remains uncorrected, then that stands as a precedent that goes beyond what Jones v. Harris said. I mean, essentially, the district court, and this is the way the district court looked at the record. This is the prism through which the district court saw the record and evaluated it. And I'll give you an example. He says, Do you believe that the district court, and I hate to interrupt you, but I don't know whether you need to go through, though, what you were about to say. There are six factors that I know of that the district court needs to look at. Do you believe that the district court did not evaluate this claim under the six factors? Yes. I believe the district court did not fairly evaluate the claims under those factors. He went through the factors, each of the factors, and his findings and conclusions. But he also did not properly apply those factors according to what Jones and Gartenberg require. Well, I guess then let's get right to it, because it seems to me that the real factor you're going after is that factor relating to the board itself. That is certainly one, but I believe that in addition to that, the portions of the judge's findings and conclusions below essentially read the economies of scale and the profitability, Gartenberg factors, out of the equation. Let me ask you a question so that we're together then. Was there any other factor you wanted to constrain? I interrupted you. I think he also erred in how he discussed what's involved in the nature and quality of services factor. All right. As to the purported deficiencies in information possessed by the directors, I guess as I read the test, those deficiencies relate to the level of deference afforded to a board approval and not to whether by itself it's disproportionate or not. Would you agree with me? They certainly relate. Would you agree with me? Not completely, Your Honor. No. Not completely, no. All right. I agree that certainly it relates to the level of deference to show. But I also believe that if the directors have been badly misinformed or are grossly uninformed about important considerations, and then they're asked to approve a fee, if it's a situation that is extreme enough that people operating at arm's length would have said, no, I won't approve the proposed fee because you haven't given us the information we need. Again, I appreciate where your argument goes. But again, to the extent of the information given to the directors and their determination of what to do, I can say to myself under this statute, giving no consideration to what the directors said, because they didn't have the information they should have got, they weren't on top of the thing, so that's not where I'm going. But it doesn't seem to me that that just topples the apple, if you will, that there are five other factors that I also have to look at. Your Honor, I agree that that merely the fact that the directors are uninformed and are deficient in their process doesn't end the investigation. You also look at whether there's additional information in the record that will either support the fee or indicate that the fee is excessive. I certainly agree with that, and I think our appeal is based not only on the fact that the directors' process was very deficient, but that there is a lot of evidence in the record which, if it was reviewed by the district court applying a correct standard, would have supported a victory for us down below. As I understand what you're saying to us, you're saying that the court recognized the factors, but in weighing the evidence, he erred. And so were we actually evaluating whether there was substantial evidence to support his findings? I believe, Your Honor, that while there was evidence in the record that he was able to refer to to support his findings, the problem is that he articulated, number one, he articulated a standard that was very wrong, and for that reason you say the standard, that would be the question of law, right? Yes. And then he applies the facts to the standard. And on what standard did he misapply? Did he misunderstand these five or six standards, factors? Well, he certainly misunderstood. He misunderstood the extent to which he should give deference to the directors, and he misunderstood what was involved in applying the arm's-length yardstick that both Gartenberg and the other directors had. Well, taking the first one, deference, the deference that he must pay to the directors, isn't that a conclusion that he draws from weighing the evidence as to what the directors did? I don't believe so, Your Honor, because if I may, I'd like to read what I think is a critical portion in his opinion where he says how he looks at the evidence, basically. And he says, although the directors were represented by counsel and were provided with detailed materials to which they and the defendants can point to and say, see how thorough and careful we are, the entire process seems less a true negotiation and more an elaborate exercise in checking up boxes and papering the file. Nonetheless, and here's the crucial point, I think, Your Honor, that is what controlling law and SEC regulations demand and is sufficient to immunize defendants against Section 36B liability so long as the fees charged are not grossly out of line with the range of fees charged in the industry. Now, that is the standard that was in the judge's mind when he reviewed the evidence. And basically what he said was as long as they checked the right boxes and they had enough paper in front of them, the cases don't require any more than that and they are – and the fund is immunized from liability. Provided the end result is that it's not a disproportionate fee. Well, he said, Your Honor, he's saying in that section that as long as they've done that, which is making a good record, that's enough to immunize them against liability, even if the process is deficient, and in this case. So long as the fee – you didn't read the last part of that that you read. So long as what comes out of the product is one that's not disproportionate. No, he didn't say that. What does the last part say? So long as the fees charged are not grossly out of line with the range of fees charged in the industry. He's referring there. I thought that's what I just said to you. When I said disproportionate, I meant out of line. That's different from disproportionate because comparative fees, whether you're out of line in the industry, of all the Gartenberg factors, is the one that both Jones v. Harris and Gartenberg said is the one that deserves the least wage. And he's saying that's the only way a plaintiff can win here. As long as they've kind of covered themselves by papering the file, checking the boxes, the only way they can win is if the fees are grossly out of line with the industry, and that can't be right under Gartenberg and Jones because Gartenberg and Jones says that's the least important factor. But it is a factor. It is one factor. It is one factor, but it's a factor that Judge Feesbelow as well as the Supreme Court and the Second Circuit and Gartenberg said that deserves the least weight because there is no arm's-length bargaining between advisors and the funds throughout the industry, so we don't want to put much weight on that. But he said essentially if you make a good record, that's the only way you can win. Let me move to a different issue, if I could, your argument about the 12B1 fees. Yes, sir. It's my understanding as to those fees, you don't challenge the finding, the court's finding with respect to substantive profitability. You don't necessarily challenge the court's findings with respect to fallout benefit or even the comparative fee analysis, it seems to me, where the court didn't find that those were going to establish liability. It seems to me that your quarrel here with the judge is that we're really looking at nature and quality of service and with the director's conscientiousness, which you've always said. Now, the court, I thought, didn't quite agree with your analysis as to nature and quality of services, but accepted your theory and said even accepting your theory, this is a matter of me taking one expert or the other expert and deciding who I believe. Now, if that's so, and I think that's what the court did, how do I undo the district court on what expert it believed? I understand your disagreement. What the court ignored below really was that setting aside that the expert reported The reasons I'm trying to get right at this is you're trying to suggest that on appeal I should look over the bench at the DJ who had the experts in front of him, relying on their testimony, trying to decide who was telling him the truth and who wasn't that I'm to say, boy, I think I can tell you that you're just out to lunch. Well, I'm not quite saying that, Your Honor. I think both for the reasons I already said and because there's language in the judge's opinion where he says you know, there's really no way to apply this arm's length bargaining yardstick. It's impossible. And that's in his opinion. For that reason, when he looked at the record, he was looking at it in a way that wasn't giving us the benefit of what the right standard was. And so we believe that if you look at it under the correct standard, even without the expert testimony on 12b-1 fees, there's strong evidence that the payment of the 12b-1 fees was hurting the funds. The fees were being used to grow the funds dramatically. The executive committee of the advisor decided in 2003 this was a big problem. They went through a huge change in their investment function called disaggregation. The judge below said this disaggregation program solved the problem, but the disaggregation program, the earliest that it clicked into place really and started to work, and it's probably not even that early, it was February 2006. So you have 2004, 2005, and each year the fee has to be re-evaluated. When the executive committee and the survey responses from the professionals were recognizing they had really difficult problems that hadn't been solved yet that were impairing the investment function, they were impairing the investment function. Well, I hate to take your time because you're about to lose all of it, but I thought as the advisory fees, I know your argument is that it's an economies of scale factor and that using the economies of scale factor that we can find liability. The district court heard that argument and said, no, based on the expert testimony, I'm not going there. That again to me says he had the evidence in front of him. He looked at it. He decided one expert was better than the other. Well, Your Honor, we believe there's clear error in what the judge concluded. Because why? Number one. Sorry, that's a bad question. That's an idle question. Number one, he said there's no evidence of economies of scale because there's no evidence of economies of scale other than from the expert. In three or four different places, contemporaneous documents, the defendants agreed they were economies of scale. We also have a situation where his criticisms, as we show in the brief, his criticisms of our economies of scale analysis are internally inconsistent. I see that I'm out of time, Your Honor. Well, why don't you sit down and wait for your opponent to give us the business, and then I'll probably have a weakness of heart and give you some rebuttal. I very much appreciate that. Good morning, Your Honors. May it please the Court. My name is Jim Benedict, Terminal Bank Tweed Counsel for the defendants' appellees. At trial and on appeal here, the plaintiffs ignore the well-established standard for liability under Section 36B, and here today and throughout its brief seek to recycle factual arguments that were already made below, carefully considered, and rejected by the district court. And, yes, Judge Brewster, there is substantial evidence to support each of those findings, and they are copiously cited to the record. As the Court is well aware, the standard for liability is clear. Jones, unequivocally, 9-0, the Supreme Court held to face liability under Section 36B, an investment advisor must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. And this is the standard that was first established in Gartenberg 30 years ago. And the Court in Jones also at least referenced the six Gartenberg factors, which in all the prior cases have been considered by the Court and were squarely considered here. And, Judge Smith, with respect to the deference issue, I don't think the Supreme Court could have been more clear when it stated that an advisor's compliance or noncompliance with its disclosure obligation is merely a factor that must be considered in calibrating the degree of deference that is due to a board's decision to approve the advisor's fee. Now, here, this Court found, although it found that obviously the directors were perfect. The district court. The district court. Okay, because she said here, this Court. The district court in this case, Your Honor. I haven't found anything yet. No, no. The district court in this case. And I probably won't find anything. I'll just decide if they found it correctly. Well, I think Judge Fieselow did find it correctly. He had a couple of criticisms of the directors. But this is overall what he found of the directors. They were well-qualified, successful, well-educated people, were provided with comprehensive information. They were advised by independent counsel. They considered each of the Gartenberg factors each time they approved the fees, and looking at the record as a whole, and I quote, carefully and diligently exercised their responsibility in approving the fees at issue. So under Jones, the district court could have deferred to the business judgment  It seems to me that the district court went further than that I read in the record. The district court found the directors had all the information they needed to make the determination. You're absolutely correct. And there was expressed findings. Even though he criticized them. He said there were two areas they could have inquired that he thought they should have inquired more. But that, put it in context. It's out of the dozens and dozens and dozens of issues that were confronted with this board over a period of the six years at issue in this litigation. And when it came to what information did they get, who were they, there are copious findings. When you look at the district court opinion, there's over 100 findings of fact that go to who the directors are, what information they got, and what they did with that information. So in doing, the district court went further, looked, gave rigorous scrutiny, to use the Supreme Court's term, to each of the factors. It didn't have to do that. It went the extra yard. And in doing so, Judge Fees considered all relevant circumstances and made comprehensive findings concerning each of the Gartenberg factors which supported his decision. And I think here it's important not to lose sight of the forest through the trees because the plaintiffs got a lot of myths that they look at. But when you look at the record as a whole, let's just review briefly the factors. One, with respect to nature and quality of the services, the district court judge found that they were of high quality, that the long-term performance of the funds ranged from good to excellent. And this is net of fees. The trading services consistently surpassed industry peers. The funds had amongst the lowest commission rates that they were paying on their trades in the whole industry. There's over 15 million shareholders. And the number of shareholder complaints was de minimis. And the rate of shareholder redemptions, the shareholder selling, was less than half the industry average. He found all of this showed shareholder satisfaction with the services that were provided. Indeed, each of the plaintiffs in his express findings citing to the depositions said that they were satisfied with the services that they got. In terms of profitability, he goes to profitability. He finds it's reasonable. It's within the range that courts have deemed acceptable. It's comparable or less to what other investment advisors were earning in the same industry. In comparative fees, clearly, Judge Fees said it was a relevant factor. But like the Supreme Court, he expressly said it should be given light weight, contrary to what Mr. Congress just said. If you look at excerpts of the record at 101, which is conclusion of Law 76, he expressly says that this should, comparative fees should be given less weight. But there, the fees he finds are lower than the industry averages and are often amongst the lowest in their respective peer groups. I think I understand your argument in this particular area. Would you turn to the discovery stuff? Sure. The district court denied discovery of the employee level compensation data. The district court denied discovery of the audit papers from the third party. Now, in denying that discovery, counsel suggests it denied the opportunity, if you will, to put evidence on that would shape this decision. Okay. Let me take each one, Judge Smith. Okay. Let's deal first with employee level compensation. Now, both of these issues, put in context, are coming up after four years of discovery, within three or four or five weeks of the end of the discovery period. We understand that. Okay? But we've all been lawyers, and we know that all happens. Okay. So let's go on. And clearly, the standard of review here is did the district judge abuse his discretion? With respect to employee level compensation, in the document to me, there were only two requests. Point is, we're relying upon request number 14 and request number 16. That's correct. He finds one had to do with the impact of growth on the funds, and the other asked for profitability information. Neither of those requests went to individual employee level compensation information. And the only two precedents that I'm aware of in this whole area, both district judges denied that. That's the Strigley-Body case in the Northern District, and the Bennett case in the District of Massachusetts. He also found, so not only did he not ask for them, but they were irrelevant under Gartenberg. The standard under Gartenberg is are the fees disproportionate to the services rendered? And if so, the investment advisor has satisfied its fiduciary duty. It doesn't go to what the use, what the advisor may do with those fees. If they are fairly charged, if the shareholders have gotten a fair bang for their buck, the advisor can use that money any way he wants to. And he found that there, and it's also, it's consistent with the Second Circuit's decision in Belicoff. It's consistent with a whole host. So it is irrelevant under 36B purposes. And in any event, for profitability, there was tons of information produced on profitability. They have the plaintiffs, they have the audited financials of Capital Research and Management Company. There was no dispute as to what the profitability was. And the second issue, which was the Deloitte Works Papers, which really goes to the same thing, a different way. It's the same issue. It's the same issue indirectly. But it is audit papers. It's audit papers. But here, again, one, let me just start with the fact, the plaintiffs waived that argument by not appealing the magistrate's decision to the district judge. That was not done. And under Rule 72a in this Court's decision in Simpson v. Leo Astronix, that's waived. But putting aside that, the district judge was clearly within his discretion to deny that. First of all, Deloitte had audited through GAAP procedures, had produced the profitability statements. So there's no question that's produced. What plaintiffs want to do is go behind that and, in essence, re-audit, redo the Deloitte audit. And these work papers were voluminous. Deloitte is a third party. This is on the eve here. The defendants already had produced profitability data. And what he says was the proper place to get profit. I think legally, if my recollection is correct, there were thousands and thousands of pages of the Deloitte work papers. Capital Research is a big company with worldwide operations. So he was clearly within his discretion to find a burden here. Let me change to another issue. We received a 28J letter. Did you get a copy of that? I did. I read it this morning. We just got it this morning, too. Well, let me just mention a couple things. This is a case I know a little bit about because I'm counsel to the defendants in that litigation as well. That case is on a motion to dismiss. Here we have a two-week trial with 1,600 pages of trial testimony and more than 1,500 trial exhibits. So that's on a motion to dismiss. It's dealing so there's no just bare allegations assumed to be true. Here we've had a full two-week trial, and we know what the services were, specifically provided. Plaintiffs use this in the context of administrative services fee. What that is is basically transfer agency services that are being done by the brokers because they're omnibus accounts so that Capital Research has one massive account for Merrill Lynch. It doesn't know who the individual customers are. So when it comes to processing buys and sells and taking care of tax information, that has to be done by the broker because they're the only ones that know the customer. So administrative service fee is to pay for those services by the broker. And also, this is Capital Research. They are responsible for the services delivered. So they have oversight and monitoring and assistance. And there's extensive testimony from Mr. Govetsian and others at trial as to those services. So here, there's no question what happened in Citibank is the allegations are the advisor hit the ball. And they deferred to third parties to do the transfer agency service, gave them a piece of the action, and then kept the rest to themselves and didn't tell the board. And that's not what's happening here. First of all, there's extensive disclosures to the board as to what the – all you have to do is look in the director information books, There's extensive disclosure to the board as to what the brokers were doing in terms of the transfer agency services. There's also extensive testimony as to what the advisor was doing, CRMC. And let me just defer you here to one second to the Court's findings on this particular issue. Among other things – Maybe you could give us the record. Sure. I'm going to refer you to the excerpts of the record at 50 to 52, which were paragraphs findings of facts 195 through 203. All right. So he goes through both the assistance and oversight through AFS, service centers, and whatever. So that case, the Solomons-McBarney case, couldn't be more different. And then to top it off, Judge Smith, Judge Feist found that the administrative service fees overall were at the low end of the scale in the industry. So very, very different case of no particular usefulness here at all. Let me just address for a second the economies of scale. Judge Smith, you are absolutely spot on. The district court judge expressly rejected the analysis of plaintiff's expert and accepted the analysis. And it lists in its findings expressly why it was wrong. Plaintiffs had not done an economies of scale analysis. Now, to the extent that Mr. Congress mentions that defendants in testimony had admitted they exist, that's not quite right. What Mr. Hage and others said, that in the short term, there are economies of scale. In the very short term, like with this big, huge influx of assets. But that over time, you have to expand your workforce. And here it doubled over the period of the litigation in order to accommodate the additional accounts. And here the accounts grew from $30 million to $70 million over this period. So there are no long-term economies of scale. And in any event, the ultimate question, even if there were, the question is whether they're fairly shared with fund shareholders. And here the court said, yes. There are four different ways to share economies of scale, and they were shared with fairly shared here in each respect. Break points, over $600 million in break point savings. Fee waivers, another $600 million. They were low fees to start out. These are amongst the very lowest fees in the entire industry. There are very few places you can go to pay less than you get with the American funds. And in any event, there was massive investments in shareholder services. That line testified at length about the investments in the trading program. Mr. Rothenberg, the CEO, talked about the massive investments in research and personnel. So the bottom line is, any economies that existed were shared. And even Plinkett's expert admitted that, on his own study, that 40 to 46 percent of any economies were shared. If I can just take one short question with that. Yes, Judge Pruitt. You mentioned that we're only interested in what they charge. We don't care how they use the money that they get. I'm not sure I understand the law to be that way. For example, they can charge reasonable fees, but if they take the fees that they get and they, let's say, inappropriately spend it. Let's say a house out in the desert for some paramour or something, money is taken out of the fund of the advisor for inappropriate purposes. Isn't that reachable by the statute? We're not talking, Judge Brewster, about taking money out of the fund. These are fees. You said that we're not interested in how the money is spent. By the advisor once received. I'm talking about the advisor. So the fund pays an investment advisory fee. But if the advisory, the fund advisor, takes funds, money that it gets in fees. Yes. And inappropriately dissipates it, doesn't the statute reach that? No. Doesn't the shareholder have an objection to that? No. The shareholder doesn't care. As long as the shareholder is paying a fair fee for a fair service, that shareholder, 36B, is satisfied. The question then is what, is there a restraint under Section 36B on what fairly earned profits by the advisor, what he, it does with him. The answer is absolutely not. If it wants to buy fancy artwork for the walls, if it wants to invest in capital and buy trading systems or whatever, or it wants to invest in desert land in Arizona, that's a decision by the advisor. 36B doesn't get to that. Now, there are all sorts of other common law and other statutes out there that certainly would regulate the conduct of any company. But it's not Section 36B. Section 36B is directed solely to the excessiveness of the fees. What is paid by the fund and what does the fund get back in exchange for those fees? The Supreme Court couldn't be more clear on that. In fact, went out of its way, said the focus is excessive compensation. So that's why you don't get into what various executives might be paid. That's a decision for capital research. That's not within the scope of 36B. Thank you very much for your argument. Thank you, Your Honor. Counselor, I know you went over, but I'll give you two minutes. Thank you, Your Honor. First, I'd like to address whether there's a difference between show of excessiveness and what the use is. I think if you look at it in terms of what people would do in arm's-length bargaining, anyone who's doing arm's-length bargaining would want to know how are you going to use these fees. And if the fees were something, were a use that hurt the fund, they would refuse to pay those fees. And that goes directly to whether the fees were excessive. Do you have a statute or a regulation to support that statement? Well, I don't think it's covered specifically by the statute, but the 36B simply says, speaks to breach of fiduciary duty through excessive compensation. But the courts have said you have to look at what people would be willing to do in an arm's-length bargaining relationship. And I believe that in that kind of relationship, the people who are asked to approve the fees would not approve them if they thought the use that was going to be made would actually be harmful. Why would they do that? If I could turn to the issue about the discovery motion that we were denied and the impact of that on trial, I think what happened was the judge at trial ultimately realized that the information he didn't let us get was crucial and important. And he scathingly criticized the directors for not getting it himself. And he repeatedly asked questions to see if something could be come up with. In essence, he acknowledged that it was very relevant information to the question of profitability. And if what that motion went to was whether the payments that were made from the profit-sharing plan over and above salaries and bonuses, whether that should be treated as an addition to CRMC's profitability. And an off-the-cuff analysis that isn't necessarily accurate, one of the directors at the trial said he thought maybe it would take it from $883 million to $1.3 billion. So the directors on advisory fees never got the economies of scale information they kept asking for. They asked for the hard data and didn't get it. They never knew the information they needed to know about profitability. We were denied the information about profitability that we should have received on discovery. I think that by itself is a good reason to send it back, to give us that discovery and to have the court take a new look at it. Thank you. Your argument time is over. Thank you, Your Honor. Case 10-55221, Hellenic v. Capital Research and Management Company is submitted.
judges: Brewster, Fletcher B. , Smith N. R.